Cletus PARKER, Plaintiff-Appellant,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant-Appellee.

No. 83–2312.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1984.

Decided Aug. 14, 1984.

Lonny Ben Ogus, Chicago, Ill., for plaintiff-appellant.

* Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals for

John W. Powers, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellee.

Before PELL and FLAUM, Circuit Judges, and HENLEY, Senior Circuit Judge.[*]

PELL, Circuit Judge.

Defendant-appellee Federal National Mortgage Association (FNMA) dismissed appellant Cletus Parker after a sweeping staff reorganization eliminated twenty-three positions at FNMA's Chicago office. Parker brought this suit against his former employer alleging that FNMA's decision whom to dismiss was discriminatorily motivated in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (ADEA). The district court, 567 F.Supp. 265, entered summary judgment in favor of FNMA, and Parker appeals maintaining that trial was necessary to resolve disputed factual issues. At issue on appeal is whether the submissions of the parties give rise to a reasonable inference of discriminatory motive.

## I. FACTS

The undisputed facts in this case are complex, but for purposes of deciding the narrow issue on appeal, we may distill them to an essential few. FNMA is a publicly held United States corporation with its headquarters in Washington, D.C., and regional offices in Philadelphia, Dallas, Los Angeles, Atlanta, and Chicago. The corporation purchases mortgages from primary lenders and services the discounted obligations. Our principal concern is with the Chicago office, where six divisions of FNMA operated until 1981. One of these divisions, the Project Mortgage Division, serviced mortgages on multi-unit properties such as hospitals, nursing homes, and apartment buildings. Prior to 1981, the Project Mortgage Division comprised four servicing teams and one purchasing team.

the Eighth Circuit, is sitting by designation.

Each team consisted of one Senior Loan Representative (SLR), who supervised the team, one Loan Representative, one or more Loan Technicians, one Secretary, and one or more Clerks. In 1981, Parker (age 62) was one of the five SLR's in the Project Mortgage Division, the others being Thomas Monico (age 31), Meredith Wright (age 55), Craig Bromann (age 31), and Robert Haren (age 57, SLR for the purchasing team). Since at least 1978, Parker's supervisor Howard Morton annually evaluated Parker and summarized his opinions in a formal document called an "Employee Performance and Development Review." Parker received marks of "excellent" and "superior" in all seven evaluation categories, but he never received a mark of "exceptional," the highest possible evaluation. Morton also praised Parker for his technical abilities in accounting and auditing. The only consistently negative comment about Parker was that he had a somewhat autocratic personality and had difficulty "interfac[ing] with subordinates." Morton also wrote formal evaluations of Monico, who received marks of "excellent," "superior," and, not infrequently, "exceptional." In 1978, Morton entered the following description of Monico on the Employee Performance and Development Review: "This is one of the younger members of the Regional staff who, with the others, comprise [sic] a strong asset base that portends well for the Corporation."

In 1978, FNMA officials in Washington directed the Chicago regional office to reduce the number of Project Mortgage service teams from four to two. The Washington office ordered the reduction because the economic recession of the late 1970's had reduced the number of mortgage obligations lenders desired to discount. The task of selecting whom to retain as supervisors of the remaining two teams fell to Morton. Morton selected Monico and Wright because, in his words, "Mr. Monico's job performance had always been consistently rated as superior, ...[and] I felt that Mr. Wright's performance and qualifications were better than the other two Senior Loan Representatives." Rather than

dismiss Parker and Bromann, Morton elected to retain them as SLR's on the remaining two servicing teams. Their positions, however, were designated "overfill," and Morton contemplated that Parker and Bromann would be placed in other positions within the Chicago office as soon as vacancies occurred through the normal course of attrition.

In November 1981, a more pervasive change came to the Chicago regional office. FNMA officials in Washington decided that the Atlanta and Los Angeles regional offices should service project mortgages from all regions of the nation. The Chicago office transferred its loan portfolio to Los Angeles and Atlanta, and it consolidated its Project Mortgage Division into one new division called the Production and Loan Administrative Division. The consolidation resulted in the elimination of twenty-three positions in the Chicago office, eighteen of which were to come from the former Project Mortgage Division.

The task of deciding whom to retain fell to Morton, once again, and to four other FNMA regional officials. Under the new Chicago organizational structure, there would be one SLR position for the purchasing of mortgages, and that position went to Haren, who had supervised the purchasing of mortgages for the Project Mortgage Division. There would also be a new position, called Manager, Loan Administration, and Monico was designated to fill that position because, in Morton's words, Monico's record showed "prior superior qualifications and performance." The Marketing Division required two new SLR's, and Wright and Bromann were placed in those positions because they had expressed interest in the area and had favorable interviews for the positions. Eight other members of the Project Mortgage Division whose positions were eliminated were transferred to other positions within the Chicago office. In some of those eight cases, the transferred members of the Project Mortgage Division forced another employee out of the transferee position. The bumping process was utilized when the

transferred employee was considered better qualified than the incumbent in the transferee position. Eight members of the Project Mortgage Division for whom there was no transferee position were terminated. Parker and Virginia O'Rourke (age 59, Project Mortgage Loan Representative) were dismissed. Bumping was considered in the case of Parker, but all the employees in the loan representative positions, the work classification beneath SLR, were considered better qualified for those positions than was Parker. Morton stated he did not consider transferring Parker to the next lower rank, loan technician, because that would have entailed a $20,000 reduction in salary and he doubted Parker would have accepted such a change.

In December 1981, Morton met with Parker and informed him that he could inquire on Parker's behalf into a transfer for Parker to the Atlanta regional office, which perhaps needed an additional SLR. Morton in fact obtained approval for Parker's transfer to Atlanta, but Parker decided to decline the transfer for three reasons. First, he did not want to sell his house at the time because selling prices were depressed. Second, the transfer would require Parker's wife to give up her current position. Third, Parker had no guarantee that his new job in Atlanta would be a permanent one. Parker thus went into involuntary early retirement. As an early retiree, he received a smaller pension from FNMA than the one he would have received had he remained an employee until the customary retirement age.

After exhausting his administrative remedies, Parker brought this suit in August 1982 alleging age discrimination under the ADEA. Following extensive pretrial discovery and the submission of depositions, affidavits, and other documentary evidence to the district court, FNMA moved for summary judgment. Judge Shadur granted FNMA's motion, reasoning that Parker had failed to show the court he was prepared to present evidence at trial that would demonstrate that FNMA discriminated against him because of his age. Judge Shadur acknowledged that summary judgment often is inappropriate when the case turns on an issue of motive and intent, but he held that summary judgment was provident in this case because "plaintiff has no indications of motive and intent supportive of his position to put on the scales for weighing."

## II. DISCUSSION

Section 623(a) of the ADEA, as codified, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's age." 29 U.S.C. § 623(a). [Emphasis added.] Thus, an employer does not violate the ADEA merely by discharging an employee whose age falls within the protected category. Rather, an employer incurs liability under Section 623(a) only if he discharges or otherwise discriminates against an employee "because of" the employee's age. In cases brought under the ADEA, this court has applied the method of showing causation established in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Monroe v. EEOC*, 736 F.2d 394 at 402–403 (7th Cir. 1984); *Golomb v. Prudential Insurance Co.*, 688 F.2d 547, 550 (7th Cir.1982). *Cf. Mason v. Continental Illinois National Bank*, 704 F.2d 361, 365–66 (7th Cir.1983). Under the *McDonnell Douglas* method:

> [T]he plaintiff [first] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). As we stated in *Monroe,* "The *McDonnell Douglas* method of proof is simply a commonsense method of proving [discrimination].... Plaintiff, in essence, must eliminate [the proffered] legitimate reason for the employer's action to establish that the employer was motivated by an illegitimate reason." *Monroe, supra,* at 403.

◼ Had the case at bar gone to trial, there is little doubt the proceeding would have focused on the third element of the *McDonnell Douglas* formula. Parker would have had little difficulty establishing a prima facie case as defined in *McDonnell Douglas.* FNMA is an employer within the meaning of the ADEA, and Parker's age in 1981 placed him within the class protected by the ADEA. *See* 29 U.S.C. §§ 630, 631. The submissions of the parties show Parker was a competent and respected member of the supervisory staff at FNMA. He consistently received good, although not top marks from his evaluators, and he was frequently commended for his technical proficiency. It is plain that Parker was a qualified candidate for the position of Manager, Load Administration, the position Monico filled, and for the position of SLR in the Marketing and Purchasing Divisions, the positions which Wright, Bromann, and Haren filled. As a supervisor for many years, Parker was also qualified to perform the duties of a Loan Representative, a position subordinate to that of SLR. The fact that Parker was not given the positions which Monico, Wright, Bromann, and Haren filled, and the fact that Parker was not allowed to "bump" a Loan Representative, would therefore complete a prima facie case of discrimination under the ADEA. *See McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

It is also plain that FNMA could "articulate some legitimate, nondiscriminatory reason" for its decision to favor other employees over Parker. The elimination of Parker's position and the transferring of employees among the FNMA divisions came about because of a general contraction in the mortgage banking industry and because the Washington headquarters of FNMA ordered the centralization of project mortgage services. Although Parker's superiors considered him competent, his ratings were not outstanding, and his superiors from time to time criticized him for not being personable, ordinarily a shortcoming for one in a supervisory position. In January 1981, Morton favored Monico and Wright based upon their qualifications and performance. In November 1981, Morton and other regional officials selected Monico to fill the supervisory position in the new division. Morton had consistently given Monico evaluation marks in the highest possible category. Haren, Wright, and Bromann were likewise considered better qualified for the positions they filled. Haren was familiar with mortgage purchasing and had performed well as SLR in the purchasing team. Wright and Bromann had previously expressed interest in urban affairs and community development, two areas of expertise that they could utilize as SLR's in the Marketing Division. Finally, Morton rejected bumping in Parker's case because the incumbent Loan Representatives had superior qualifications. Although some of the Loan Representatives had evaluation marks one level below those of Parker, none manifested Parker's perceived inability to be personable. Thus, pivotal at trial would have been the determination whether the reasons offered by FNMA for favoring others over Parker were not the real grounds for FNMA's action but rather a mere pretext for age discrimination.

Summary judgment is an effective mechanism for preempting trial where there is no disputed issue of material fact. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R. Civ.P. 56, Notes of Advisory Committee on Rules. In the instant case, it was incumbent on Parker to show the court he would produce some evidence at trial which could establish that the nondiscriminatory rea-

sons articulated by FNMA were pretextual. We cannot conceive that Parker could have produced an explicit statement from his superiors at FNMA to the effect that age was a determining factor in their decision, nor does the law require Parker to do so. An aggrieved party such as Parker can survive a motion for summary judgment simply by producing circumstantial evidence from which a trier of fact can reasonably infer that age was a determining factor in the employment decision. *See Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1222–25 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Once the plaintiff presents the court with some evidence that his employer harbored the prohibited motive, summary judgment for the defendant is inappropriate because there is a disputed fact material to the case. The district court may not resolve the factual issue, it must merely identify it and await the full presentation of evidence at trial for resolution.

Parker submitted to the district court evidence from which he claims one can reasonably infer that age was a determining factor in FNMA's employment decision. Judge Shadur ruled, however, that the evidence submitted did not give rise to such an inference. After carefully reviewing the submitted evidence, we affirm Judge Shadur's ruling.

Parker claims discriminatory motive is evidenced by Morton's comment written on the bottom of Monico's 1978 Employee Performance and Development Review: "This is one of the younger members of the Regional staff who, with the others, comprise a strong asset base that portends well for the Corporation." This comment, written three years prior to the 1981 reorganization of FNMA's regional office in Chicago, is on its face a neutral statement. It merely describes one of Monico's characteristics, namely that he is young. The comment does not indicate that Monico is considered better because he is young or that he would have received lesser praise had he been older. Although one could read into Morton's statement favoritism towards

younger employees, that is a strained interpretation particularly in view of Monico's established superior credentials. The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones. If Morton's statement were the only evidence Parker produced at trial, FNMA could successfully move for a directed verdict. Parker's hope was that he could elicit an incriminating statement from Morton upon cross-examination at trial, but a plaintiff should not be allowed to proceed with a case on the mere hope that trial would produce the evidence he was unable to garner at the stage of summary judgment. *See Kephart, supra,* at 1224.

■ Parker also claims discriminatory motive can be inferred from "statistical evidence." First, Parker maintains that on his employment level, the level of SLR, he was the only employee terminated. This fact, however, does not give rise to a reasonable inference of discriminatory motive. There were twelve SLR's in the Chicago regional office prior to the reorganization in 1981. Six SLR's whom FNMA retained in Chicago were in the protected class under the ADEA. Thus, the fact that Parker was terminated is hardly statistical evidence of discriminatory intent. Second, Parker packages his statistics differently and maintains that at the Loan Representative level, where there were also twelve employees, three of the four terminated employees were in the protected age group. The problem with Parker's statistical evidence is that it lacks sufficient breadth to be trustworthy. *See Soria v. Ozinga Brothers, Inc.,* 704 F.2d 990, 994–97 (7th Cir.1983). A small change in the underlying raw data would result in dramatic statistical fluctuations. *See Contreras v. City of Los Angeles,* 656 F.2d 1267 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). The small sample size employed by Parker as well as the selective manner of categorization prevent Parker's "statistical evidence"

from giving rise to a reasonable inference of discriminatory motive.

This case came to Judge Shadur following extensive pretrial discovery. The submissions of the parties reveal that the decision to terminate some employees at FNMA's regional office in Chicago was taken because of a contraction in the mortgage banking industry and a centralization plan designed by FNMA officials in Washington. Those responsible for individual employment decisions explained their choices by the relative strengths and weaknesses of their staff members. Decisions such as these will always involve a number of subjective factors, and disappointed candidates cannot expect a federal judge to intervene simply in the hope that he or she will evaluate the factors differently. The ADEA only requires the intervention of the federal judiciary when age is a determining factor in the decision. Through pretrial discovery, Parker had the opportunity to show age was a determining factor by obtaining evidence from which one could reasonably infer that the legitimate, nondiscriminatory reason articulated by his superiors was pretextual. Parker failed to show the court that he could present such evidence at trial. In a case such as this, where trial would be a fruitless endeavor, a grant of summary judgment must be upheld.

▪ The district court also granted summary judgment on Count II of Parker's complaint, which alleged that FNMA discriminated against Parker when it denied him severance pay on the basis of his status as "retired." As we read the record, however, the decision whether to be retired or laid off was made by Parker. Hence, this case is not analogous to *EEOC v. Borden's, Inc.*, 724 F.2d 1390 (9th Cir.1984), where the Ninth Circuit held that older employees who had no choice but to give up severance pay had a valid claim under the ADEA. We accordingly AFFIRM the district court's grant of summary judgment as to the entire complaint.